**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**CHRISTOPHER M. SEWARD,** )<br>)<br>)<br>**Defendant.** )<br>) | **NO. 5:25-CR-00050-REW-MAS** |

**MEMORANDUM OPINION & ORDER**

When is enough enough? Unquestionably, Defendant Christoper M. Seward ("Seward") has a troubling criminal history. He is charged with serious and dangerous crimes. And yet, Seward has spent a year abiding by state bond conditions, maintained his sobriety without incident at an in-patient substance use treatment facility, remained employed, and modeled leadership in his support groups. The United States argues that Seward has not and could not do enough to overcome his prior criminal activity. Seward, without denying his past, counters that his actions this past year are enough to demonstrate a new direction. The Court finds Seward has done enough.

**I.   PROCEDURAL HISTORY**

On April 17, 2025, a federal grand jury returned a four-count indictment charging Seward with fentanyl and fluorofentanyl trafficking offenses. The United

States alleges that he conspired with Rhonda Seward and Stephen Orberson and possessed with intent to distribute these substances on multiple occasions. [DE 1].

Defendant Christopher M. Seward ("Seward") appeared before the undersigned for an initial appearance on April 30, 2025. [DE 24]. The United States orally moved for detention under 18 U.S.C. § 3142(f)(1)(B) and (C). [DE 11]. A detention hearing was held on May 6, 2025.

## II. LEGAL FRAMEWORK

Given the charges, a detention presumption arises under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.*, ("BRA") as to both nonappearance and danger risk. 18 U.S.C. § 3142(e)(3)(A). Accordingly, a defendant carries a "burden of production" to overcome the presumption by offering "at least some evidence" that he is neither at risk of nonappearance nor endangering the community. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). The production burden "is not heavy," and the Government retains the ultimate burden of persuasion. *Id.* If the defendant fails to rebut the presumption, he must be detained. Even if the defendant rebuts the presumption, the presumption remains a factor in determining detention. *Id.* ("The presumption remains as a factor because it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

However, if a defendant rebuts the presumption of detention, the burden shifts back to the United States to persuade the Court that detention is nevertheless warranted. Detention, based on danger, must rest on facts supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A flight-based (or, more accurately,

nonappearance-based) detention decision must rest on facts supported by a preponderance of evidence. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-82-DCR, 2006 U.S. Dist. LEXIS 49661, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with conditions imposed. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291 [published in full-text format at 1998 U.S. App. LEXIS 13553], 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The nature and quality of proof impacts its probative value and weight in the detention calculus. The § 3142(g) factors guide the analysis.

### III.   ANALYSIS

The Court conducted a Detention Hearing and afforded both sides all procedural rights outlined in the BRA. Below, the Court shall consider all testimony, proffer, and arguments from the parties to assess whether Seward has overcome the presumption of detention and, if so, whether the United States met its burden of persuasion that the § 3142 factors demand detention.

A. **RISK OF NONAPPEARANCE**

Preliminarily, the Court finds that Howard overcame the presumption as to his risk of nonappearance. Seward offered the credible testimony of Jerrod Thomas ("Thomas"), President and CEO of the Shepherd's House. Shepherd's House is a structured residential treatment and reentry program operating across multiple Kentucky counties. Per Thomas, Seward has fully complied with the conditions of his state court release for the past year, despite the serious penalties he faces in that parallel prosecution. During that entire year, Seward has resided at the Shepherd's House and has not only abided by program rules but has excelled within the reentry framework. He completed Phase I of the program, is employed full time with a contractor doing HVAC work, and has taken on a mentorship role within the facility. Thomas further noted that Seward has advanced to Phase II, which includes greater independence and increased community access, without incident or cause for concern. In fact, Thomas was prepared to move Seward to Phase III, which involves independent living at an apartment owned by Shepherd's House while Seward continued his HVAC work and was also employed by Shepherd's House to peer counsel support groups.[1] Importantly, Thomas confirmed that Seward has never tested positive for drugs (despite weekly random testing), has maintained employment, and has not attempted to abscond, even when given with increased autonomy. When Seward was informed of the potential federal charges and arrest warrant, Seward communicated the information to Thomas, spoke with his sponsor

---

[1] Thomas testified that, considering the new federal charges albeit for prior conduct, Seward would remain in Phase II residing at Shepherd's House if released.

daily, and surrendered to federal authorities as scheduled. This evidence satisfies Seward's burden of production relative to overcoming the presumption of detention.

Despite Seward's demonstrated success while on state bond, the United States contends that he nonetheless presents a risk of nonappearance sufficient to warrant detention under the BRA. Specifically, the government argued that, because Seward committed certain offenses while on bond in a separate state proceeding, he cannot be trusted to comply with any future conditions this Court might impose. The Court does not discount the seriousness of the allegations, nor is it indifferent to the fact that Seward picked up new charges while previously on bond. However, that alone does not amount to preponderant evidence that Seward is unlikely to appear as required in proceedings before this Court considering his conduct at Shepherd's House.

Notably, the government did not identify any instance in which Seward failed to appear in court. While the PSR does reference a 2002 conviction for fleeing or evading police, that conduct occurred more than two decades ago and bears little relevance to the present inquiry into his current nonappearance risk. *See United States v. Tackett*, No. 5:25-CR-00029-KKC-MAS, 2025 WL 1105312, at *2 (E.D. Ky. Apr. 8, 2025). The PSR also notes that Seward was charged with resisting arrest in connection with the April 22, 2024 incident in Boyle County, during which he allegedly attempted to pull away from officers and kicked one while being placed into a police cruiser. [PSR at 14]. Even so, resisting arrest may show a propensity for ignoring a Court's instructions but provides little evidence that a defendant will not

appear. In fact, Seward's lengthy criminal history demonstrates that if he does anything, he generally appears for court.

By contrast, Thomas testified that Seward has been fully compliant with both his state bond conditions and the rigorous requirements of the residential treatment program for nearly a year. He characterized Seward's participation as active and meaningful, noting his sustained sobriety, consistent employment, and leadership as a mentor to others in recovery. This record of compliance strongly undermines claim that Seward presents an unmitigable risk of nonappearance. Seward's self-surrender to federal authorities, despite having no agreement with the government for release, speaks highly for Seward. Given the seriousness of his charges and the already significant penalties he faces in his state cases, his decision to surrender supports a finding that he can be trusted to appear.

In sum, the evidence of Seward's conduct over the last year, substantiated by credible third-party testimony, sufficiently rebuts the presumption. Furthermore, the government has not shown by a preponderance of the evidence that Seward presents a failure to appear for future proceedings in this Court.

## B. RISK OF DANGER

The Court next considers whether Seward should be detained based on dangerousness under 18 U.S.C. § 3142(g). Preliminarily, the Court concludes that Seward has rebutted the presumption of detention as to dangerousness. Thomas's detailing Seward's conduct over the last year to maintain sobriety, comply with state bond conditions, and contribute productively to a structured recovery environment

sufficiently overcomes Seward's burden of production with respect to the presumption of dangerousness.

Turning to the government's burden of persuasion to show by clear and convincing evidence that Seward is an irremediable risk of danger to the community, the Court finds it has not met its burden for the reasons provided below.

1.   **Nature and Circumstances of the Offenses Charged**

The charges against Mr. Seward are serious, and the circumstances surrounding them are gravely concerning. Count 1 alleges that from June 15, 2023 through April 24, 2024, Seward conspired with two co-defendants to distribute 100 grams or more of fluorofentanyl and 40 grams or more of fentanyl, all in violation of 21 U.S.C. § 846. [DE 1]. Count 2 alleges Seward possessed fentanyl with intent to distribute on June 15, 2023, in violation of 21 U.S.C. § 841(a)(1). Counts 3 and 4 charge Seward, along with his co-defendants, with aiding and abetting one another in the possession with intent to distribute over 100 grams of fluorofentanyl and a detectable amount of fentanyl between April 22 and April 24, 2024. [DE 1].

These charges trigger the presumption of detention under § 3142(e)(3)(A) and reflect the type of drug trafficking conduct that courts routinely recognize as inherently dangerous. *See United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *see also United States v. Bucio*, No. CR 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (recognizing that "the nature and circumstances of the offense in issue weigh[ed] in favor of" detention where "they ar[o]se in the context of a large drug trafficking scheme").

Additionally, Seward's charges are factually tied to multiple pending felony cases in Scott and Boyle Counties. On June 15, 2023, Scott County deputies responded to Seward's residence for a domestic violence complaint. [PSR at 11–12]. As reflected in the PSR and the United States' proffer at the detention hearing, deputies executed a warrant for Seward's arrest on charges of assault and strangulation. Upon entering the residence, they observed narcotics in plain view, secured the scene, and obtained a second warrant. [PSR at 12]. That subsequent search revealed suspected fentanyl in quantities exceeding personal use, marijuana, and methamphetamine throughout the residence and pole barn. These events resulted in charges in Scott County Circuit, in which Seward was charged with trafficking fentanyl, possession of methamphetamine, and possession of marijuana. [PSR at 12].

On April 22, 2024—while on bond in the 2023 Scott County case—Seward was stopped by Boyle County law enforcement for a traffic violation. [PSR at 13–14]. During the stop, officers detected a strong odor of marijuana. Seward handed over a bag of marijuana and admitted to having more. After conducting a search of Seward's person, officers recovered approximately $10,000 in cash from his pockets, which he claimed was from the sale of a trailer. A subsequent search of the vehicle yielded suspected heroin, fentanyl, methamphetamine, and cocaine, some hidden in a magnetic box affixed near the gas cap. Officers also located paraphernalia commonly associated with trafficking, including straws with white residue. Seward allegedly resisted arrest and had to be forcibly placed into the cruiser, during which he kicked

an officer. [PSR at 14]. These events form the basis of the Boyle County Circuit Court case, in which he faces charges including trafficking in methamphetamine and cocaine, possession of fentanyl, and resisting arrest.

Later that same day, based on information gathered during the Boyle County stop, Scott County deputies executed a search warrant at Seward's home in Georgetown. [PSR at 14]. According to the PSR and the United States' proffer, the search uncovered substantial quantities of fentanyl, marijuana, digital scales, two rifles, and a backpack containing loaded and unloaded magazines. [PSR at 14–15]. Seward's wife informed deputies that the pole barn—where much of the drug activity appeared to be centered—was Seward's "office." [PSR at 15]. These events led to charges in Scott County Circuit Court, indicting Seward with enhanced trafficking in fentanyl and marijuana and possession of a handgun by a convicted felon.

Collectively, the nature and circumstances of the alleged offenses strongly weigh in favor of detention. Moreover, while the presumption has been rebutted here, it remains a factor supporting detention. *See United States v. Lattner*, 23 F. App'x 363, 364 (6th Cir. 2001) ("The court may continue to give the presumption some weight by keeping in mind that Congress has determined 'that drug offenders pose a special risk of flight and dangerousness to society.'") (citing *United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir.1989). The Court proceeds to assess whether the remaining statutory factors and available conditions support pretrial release.

2. **Weight of the Evidence of Dangerousness**

The second factor—the weight of the evidence of a person's dangerousness—goes to the likelihood that the defendant will pose a danger to the

Page **9** of **17**

community; it is not a pretrial determination of guilt. *Stone*, 608 F.3d at 948. In weighing the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(j). The Court must therefore consider the strength of the government's case as it relates to future dangerousness and not ultimate conviction. See *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

Here, the weight of the evidence supporting the government's dangerousness theory is substantial. As noted above, Seward faces charges of conspiracy to distribute and possession with intent to distribute substantial quantities of fentanyl and fluorofentanyl between June 2023 and April 2024. The evidence discovered in his state cases included drugs, drug trafficking paraphernalia, and cash in quantities that strongly suggest trafficking.

Apart from his pending federal charges, the government likewise argues that Seward's criminal history carries considerable weight in determining his dangerousness. His earliest known conviction occurred in 1995 for operating a vehicle under the influence and driving on a suspended license. [PSR at 4]. This marked the beginning of a long and varied criminal record. In 1997, he was convicted in Lincoln Circuit Court of driving on a license suspended for DUI for which he received a one-year sentence, suspended on five years' probation. [PSR at 4]. Throughout the early 2000s, Seward incurred numerous convictions for offenses including drug possession and alcohol-related driving offenses. [PSR at 5–8]. In 2002, he was convicted in Magoffin County Circuit Court of possession of cocaine, resisting arrest, fleeing or evading police, and multiple traffic violations. By 2006,

Seward's conduct had progressed to felony-level drug trafficking. He was convicted In Lincoln County Circuit Court of trafficking in marijuana, possessing drug paraphernalia, and possessing a controlled substance. [PSR at 9]. In 2009, Garrard County authorities arrested Seward for possession of a controlled substance, operating a vehicle under the influence, and wanton endangerment of a police officer. [PSR at 9–10]. The PSR reflects that he was convicted and sentenced to eight years in prison in that case, although he was granted shock probation after beginning a residential treatment program that lasted about four months.

Seward's criminal history appears relatively limited between 2010 and 2023, aside from a handful of traffic and minor drug offenses in 2017 and 2018. That period of apparent quiet ended abruptly in mid-2023. On June 14, 2023, Seward's wife reported that Seward had assaulted her. According to the PSR, she had a visible laceration on her face and complained of pain to her head and neck. She alleged that Seward accused her of infidelity, pushed her against a wall, and used both hands to strangle her by applying pressure to her neck. [PSR at 11]. She was later transported by ambulance to the hospital for medical evaluation and ultimately filed an Emergency Protective Order ("EPO") against Seward. These allegations resulted in pending state charges in Scott County Circuit Court for fourth-degree assault and first-degree strangulation. Investigation of those charges led to authorities uncovering evidence of a drug trafficking operation, resulting in a cascade of felony drug cases in state court and, eventually, his federal Indictment.

The evidence of dangerousness reflected in both Seward's federal charges and his more than two decades of criminal history leads the Court to conclude that this BRA factor favors detention under § 3142(g)(2).

### 3. History and Characteristics of the Person

The third BRA factor considers the history and characteristics of the person, including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," as well as whether the individual was on probation, parole, or other release at the time of the alleged offense. 18 U.S.C. § 3142(g)(3)(A)–(B).

Seward is a lifelong resident of Central Kentucky. [PSR at 1–2]. He reports strong relationships with both parents and stepparents, and with siblings who reside in Kentucky, Tennessee, Georgia, and Florida. [PSR at 2]. He maintains regular contact with his adult daughter who lives in Georgia. [PSR at 2]. Prior to his residential treatment, Seward lived with his wife in Georgetown, Kentucky. [PSR at 2]. Prior to entering federal custody, he had been living at the Shepherd's House in Lexington, Kentucky, where he was engaged in a residential substance use treatment program. [PSR at 2]. Thomas testified that he could return to Shepherd's House to resume his long-term residential treatment program if released.

The Court would be remiss not to acknowledge Seward's criminal history and the fact that he incurred new charges while on state bond. However, the Court has already considered the weight of that history in its analysis under the second

§ 3142(g) factor. The Court will not overweigh that information here considering it is accounted for in the second factor and the criminal history is but one item in a long list of personal characteristics the Court is to consider.

As relevant here, the PSR reflects a substantial gap in Seward's criminal activity between 2010 and 2017. Notably, this period immediately followed his participation in a four-month substance use treatment program at WestCare. [PSR at 10]. Thus, particularly probative under this factor is that, over the past year, Seward has resided in a highly structured residential substance use treatment program at the Shepherd's House. According to Thomas, Seward has not only complied with Shepherd's House program requirements but has embraced the opportunity for rehabilitation, even assuming a leadership role among new residents. He participates in a 12-step program which includes accountability to a sponsor, case manager, and group therapy. Notably, Thomas testified that he has known Seward for at least 15 years, having first met him during a prior substance use treatment program. He observed that Seward's efforts at the Shepherd's House were markedly different, describing him as sincere in his commitment to recovery.

Although Seward's history and characteristics raise legitimate concerns, his recent conduct—marked by sustained sobriety and compliance—is mitigating. On balance, the Court finds that this factor supports release under § 3142(g)(3).

### 4. Nature and Seriousness of the Danger

The fourth and final factor is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Importantly, the danger contemplated by the BRA is not limited to

physical violence. Courts have repeatedly recognized that continued drug trafficking itself poses a grave and independent danger to the community. *See United States v. Pina-Aboite*, 97 F. App'x 832, 836 (10th Cir. 2004) ("[T]he danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community[.]"); *see also United States v. Santiago-Pagan*, No. 1:08-CR-0424-01, 2009 WL 1106814, at *7 (M.D. Pa. Apr. 23, 2009) (concluding that the alleged distribution of large quantities of narcotics "cuts strongly against [a] motion for release" because of the inference that the defendant "will simply continue his alleged narcotics activity if released").

As noted, the presumption of detention under § 3142(e) does not vanish when rebutted. *Lattner*, 23 Fed. App'x. at 364, (6th Cir. 2001) (citing *United States v. Martir*, F.2d 1141, 1144 (2d. Cir. 1986)). It continues to inform the Court's analysis, reflecting a commonsense inference: individuals charged with serious drug trafficking offenses—especially those with a history of criminality and substance use—may be more likely to reoffend if released. *See Santiago-Pagan*, 2009 WL 1106814, at *7. In many cases, that inference is supported by the record. Often, the defendant lacks a support system or any demonstrable change in circumstances. Sometimes, the environment to which the defendant proposes returning is the very setting in which the alleged criminal conduct took place.

The record here tells a different story. Seward has spent the last year entirely removed from the residence that, according to the United States, served as the hub of his alleged drug trafficking scheme. While the PSR confirms that he remains

Page **14** of **17**

married to co-defendant Rhonda Seward, they have not lived together since at least May 2024. There is no evidence that Seward intends to return to their marital home, nor that doing so is an option. His wife, for her part, no longer resides there either. She has since moved into a separate home owned by her parents.

That separation from the locus of his alleged offenses is not superficial. Seward has resided at the Shepherd's House Lexington facility since May 2024. He has complied fully with the program's strict requirements, including random drug testing, curfews, accountability to staff and peers, and abstinence from any criminal behavior. Thomas testified that Seward is not only compliant but actively engaged in the program. He also testified that the program maintains a strict policy requiring prompt notification of any deviation from its rules or conditions imposed by the Court.

The BRA requires courts to assess whether conditions can reasonably assure community safety, and a critical part of that assessment is the defendant's likely compliance. *See Tortora*, 922 F.2d at 887 (recognizing the importance of predicted good faith compliance in evaluating conditional release). Here, that prediction is not speculative. Many standard release conditions resemble the safeguards that have already proven effective during Seward's year-long residence at the Shepherd's House, including requirements to maintain employment, random drug testing, and other accountability measures. Unlike the typical defendant in a presumption drug trafficking case, Seward has already demonstrated compliance with similarly rigorous conditions in a structured residential treatment setting.

The United States has not identified any threats to witnesses or evidence, nor has it alleged obstruction, intimidation, or other conduct suggesting that Seward poses a danger beyond his alleged drug trafficking conduct. It relies principally on his criminal history and the seriousness of the pending charges as predictive of future noncompliance. Seward, by contrast, argues that his conduct over the last year is a better indicator of his current risk profile. The Court agrees that the last year of verifiable progress carries meaningful weight in this analysis. While Seward's history cannot be ignored, the government has not demonstrated that his release would present an unmitigable risk of danger to the community. This factor therefore favors release, particularly in light of the credible evidence that Seward has disrupted the patterns of conduct that previously placed others at risk.

### 5.  **Availability of Conditions to Mitigate Danger**

For the reasons discussed above, the balance of the factors does not favor detention on this record. However, the record does confirm a risk of danger. That risk, however, can be reasonably mitigated by appropriate conditions. Seward must remain in his residential treatment program and must comply fully with its rules, as the Court finds this structured environment has been central to his reduced danger risk. To augment oversight, the Court will also impose location monitoring, particularly given Thomas's testimony that Seward transports other residents as part of his mentorship role at the Shepherd's House. Additionally, Seward shall have no contact with his co-defendants. He may have non-physical, non-case-related communication with his wife, Rhonda Seward, but any in-person contact must first be approved by the United States Probation Office. This restriction is intended to

address the specific danger concerns related to her safety as raised by the United States.

The Court will discuss these conditions, and other conditions it finds appropriate, with Seward at a Status Hearing to be scheduled below.

### IV.    CONCLUSION

On balance, the Court finds that the BRA does not demand pretrial detention in this case. Seward has rebutted the presumption as to both nonappearance and danger. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Seward is unlikely to appear as required. The Court also finds that the United States did not show by clear and convincing evidence that Sewards is an unmitigable danger to the community or others. Accordingly,

**IT IS ORDERED** that the United States' oral motion for detention is **DENIED**. This matter is set for a Status Hearing before the undersigned on **Friday, May 9, 2025, at 10:00 a.m.** Following that hearing, the Court will issue a separate order setting the conditions of Seward's pretrial release.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 8th of May, 2025.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY